**J. B. MILLHOUSE, Plaintiff-Respondent,**

v.

**DRAINAGE DISTRICT NO. 48 OF DUNK-LIN COUNTY, Missouri, and S. J. Cohen Construction Company, Defendants-Appellants.**

No. 7577.

Springfield Court of Appeals.

Missouri.

June 13, 1957.

Jones & Jones, Ford & Ford, Kennett, for appellants.

Bradley & Noble, Kennett, Ward & Reeves, Caruthersville, for respondent.

RUARK, Judge.

This is an appeal from a judgment on a jury verdict for the value of a cotton crop destroyed by a construction company while acting as agent for a drainage district in the building of a levee.

The petition alleges that *at the beginning of 1952* plaintiff was a tenant of the owners of the land under an agreement to pay one-fourth crop rental. On *January 12, 1952,* the drainage district filed in the circuit court its petition to condemn a right of way over the land which plaintiff had rented. The owners of such land were made defendants and served with process, but plaintiff was not made a party and was not so served. On *March 12, 1952,* interlocutory decree was entered. Thereafter the plaintiff planted cotton on the land, and the cotton had come to a stand prior to *April 28,* on which date the commissioners made their report and the condemner paid in the amount of damages which had been awarded to the owners. It was further alleged that plaintiff continued to cultivate his crop, with no knowledge that the land had been condemned, until July 24, when he learned that the defendants intended to enter. He thereupon served defendants with notice not to enter, but nevertheless the construction company did thereafter come upon that portion of the land which had been taken in eminent domain and destroyed the crop.

Prior to trial the court sustained a motion to dismiss on the part of the owners, thus leaving as defendants the drainage district and the construction company, who are now appellants.

The filing of petition in condemnation on *January 12,* the interlocutory decree on *March 12,* the payment in of damages on *April 28,* and the mowing of a cotton crop on the land so condemned sometime in the latter part of summer are conceded.

Plaintiff testified on trial of the case that he had been farming the land crossed by the condemned levee strip here involved since the year 1912. That in the year 1952 (the year in which a part of his crop was destroyed) he started planting his crop on *April 10.* This included cotton on the

staked strip then under process of condemnation, as well as other portions of the farm. That the cotton came up in about a week and he commenced plowing it on *April 15*. The contractor mowed it (the cotton on the condemned strip) sometime in August after plaintiff had given notice not to enter.

In respect to his claim of tenancy for the year 1952, plaintiff testified in chief:

"Q. Did anyone representing the Sheltons [the owners], their farm manager, or so on, whoever it might have been, advise you that you were to have the place in 1952? A. No, there was nobody told me I had it rented, but they never did. They never rented it but the one time, when I first moved there. I just went ahead one year from the other, never rented the ground but the one time. I rented it from Mr. Frank, and I just went ahead, was never notified about nothing. They brought a contract around sometimes, and sometimes they didn't."

And, over defendants' objection:

"Q. Well, I will ask you this, Jack, nobody told you you weren't to have it? A. No, sir."[1]

On cross-examination plaintiff was asked if he had not always rented the land under written contract. His answer was:

"A. Yes, sir, I was supposed to, but sometimes they didn't bring them around, I didn't sign them always.

"Q. You were renting that land in 1951 under a written contract, this same land, weren't you? A. '51?

"Q. Yes, the year before. **A.** Yes, sir."

At the close of the evidence defendants filed motions for directed verdict, which were overruled, and the court submitted the case to the jury on an instruction which told the jury virtually and in substance that if the defendants mowed down a cotton crop which belonged to the plaintiff, without first having obtained plaintiff's consent and without having compensated him for its value, then the verdict would be in favor of the plaintiff.

### Opinion

█ Plaintiff, if he had a compensable interest in the land, was entitled to be made a party and to notice; and if this were not done, then under his constitutional guarantee he had a right to recover his damages, if any, in this action.[2]

---

1. Thereafter the court refused defendants' offer of proof by the owners' farm manager, who handled the business of securing contracts with tenants during 1951 and 1952, that in February 1952 (before the cotton was planted) he talked with plaintiff concerning the levee construction project and told him (plaintiff) that the owners would under no circumstances enter into any contract which would involve the condemned right of way, as "they" were going to build the levee on that particular property during the summer of 1952, and the drainage district right of way would not be included in any land contracts, and that his, plaintiff's, contract would be exclusive of the right of way.

   The defendants produced a lease on the land which plaintiff was farming, which lease purported to be dated January 1, 1952, and to cover the period January 1, 1952,—December 31, 1952. This lease specifically excluded the right of way of the drainage district. Plaintiff admitted he signed the lease, but stated that it was signed sometime in August or September after the crop had been destroyed. Plaintiff objected to the offer of this lease because it was not signed by both the parties (the exhibit as read into the transcript does not show the signatures). Because of other factors which we believe must control the decision in this case, we find it unnecessary to consider the lease further.

2. Hickman v. City of Kansas, 120 Mo. 110, 25 S.W. 225, 23 L.R.A. 658; Beetschen v. Shell Pipe Line Corp., Mo.App., 248 S.W.2d 66, affirmed 363 Mo. 751, 253 S.W.2d 785; Southwestern Bell Telephone Co. v. Drainage Dist. No. 5, 215 Mo.App. 456, 247 S.W. 494; Bohannon v. Camden Bend Drainage Dist., 240 Mo. App. 492, 208 S.W.2d 794.

■ But, in order to entitle him to such notice and hearing, the interest held must have been one which existed *at the time the petition in condemnation was filed.*

■ Eminent domain proceedings are in rem.[3] And one who had no interest in the land at commencement of suit (and thereafter acquired it) would be in privity with the then owner and subject to the doctrine of lis pendens.[4] The judgment of condemnation relates back *to the commencement of the proceedings.*[5] Owners, or those having an interest at the time proceedings are instituted, are the only necessary parties.[6] And one who obtains an interest from the owner *after* commencement of proceedings takes his title subject to the outcome of such proceedings.[7] Thus a leasehold interest born after commencement of suit is bound by and subservient to the taking authorized by the judgment in such suit.[8]

*What is a compensable interest in condemnation?*

■ The interest held, the property for which compensation must be rendered, though not necessarily the corporeal thing itself, must consist of some definite right of domination in and over the physical thing, such as the right of user, or exclusion, or

disposition. A mere contractual relationship is not sufficient in itself.[9]

■ Nor does one in possession as a licensee or at sufferance have a right to compensation.[10] The mere occupancy of property (at least for a short period), with knowledge but not consent of the owner, does not of and in itself imply the relation of landlord and tenant which creates an interest in the occupant.[11] And this is true of a tenant who holds over.[12] Nor does the *expectation* of renewal of a lease based on evidence that the landlord and tenant were mutually satisfied and likely to renew create any interest entitled to constitutional protection.[13]

■ A bare tenant at will, without crops or improvements, has only a "scintilla of interest," which does not amount to a compensable property interest. Anything which deprives the owner of the right to further consent to the tenancy (such as a taking under eminent domain) itself terminates the tenancy.[14]

*Was plaintiff a tenant from year to year because of successive renewals in previous years?*

■ The evidence is that plaintiff had farmed the premises for forty years.

3. City of Moberly v. Hogan, 317 Mo. 1225, 298 S.W. 237, 241; State ex rel. Scott v. Trimble, 308 Mo. 123, 272 S.W. 66, 70.

4. See discussion, Missouri State Life Ins. Co. v. Russ, Mo., 214 S.W. 860, 863–864.

5. Perkinson v. Weber, 251 Mo. 186, 157 S.W. 961(4); Ross v. Kendall, 183 Mo. 338, 81 S.W. 1107(6).

6. Lewis, Eminent Domain, 3d Ed., vol. 2, § 517, p. 935; see Stewart v. White, 98 Mo. 226, 11 S.W. 568, 569.

7. Southern Illinois & M. Bridge Co. v. Stone, 174 Mo. 1, 73 S.W. 453, 461, 63 L.R.A. 301; City of St. Louis v. Busch, 252 Mo. 209, 158 S.W. 309(6).

8. 29 C.J.S. Eminent Domain § 198, p. 1105; Nichols on Eminent Domain, 3d Ed., vol. 2, § 5.23(7), p. 46.

9. Lewis, Eminent Domain, 3d Ed., vol. 1,

§ 63, p. 52; Nichols on Eminent Domain, 3d Ed., vol. 2, § 5.23(7), p. 46.

10. Jahr, Eminent Domain, Valuation and Procedure, § 181, p. 299; Lewis on Eminent Domain, 3d Ed., vol. 2, § 531, p. 958.

11. Center Creek Mining Co. v. Frankenstein, 179 Mo. 564, 78 S.W. 785.

12. See discussion, American Law of Property, vol. I, § 3.32, pp. 235–237.

13. 18 Am.Jur., Eminent Domain, § 232, pp. 866, 867; Nichols on Eminent Domain, 3d Ed., vol. 2, § 5.23(4), p. 45.

14. Tate v. State Highway Commission, 226 Mo.App. 1216, 49 S.W.2d 282; see 29 C.J.S. Eminent Domain § 198, p. 1105; see Thompson on Real Property, vol. 3, § 1029, p. 26; see Tiedeman on Real Property, 3d Ed., § 162, p. 212.

This was done, usually, under a written annual lease between himself as tenant and the owners as landlord. In the year 1951, immediately preceding the proceeding in eminent domain, the occupancy and farming of the premises were *under such a written lease*. As he held over after the termination of the time for which the premises were let to him, no notice to quit was necessary.[15] His tenancy expired by virtue of the (1951) contract itself,[16] and such (previous) written lease negatived the existence of a tenancy from year to year.

*Did the fact that plaintiff remained in possession from December 31 to January 12 (date of commencement of proceedings) make him a tenant from year to year?*

A tenancy from year to year is a qualified tenancy at will, the qualification being that the determination of the will cannot take effect until the end of the current year, and after the statutory notice expressing determination of the will.[17]

But no character of tenancy at will (including that of year to year) can arise without *some form of consent*, either express, inferred or implied, on the part of the landlord. The mere holding over by the tenant does not of and in itself create a new tenancy. It only gives the landlord the option to renew the lease. No new term is created until the owner, *in some manner*, recognizes the tenancy as existing.[18] And a short delay in which the landlord does nothing is not necessarily a recognition of a new tenancy. Thus the bare fact that a tenant whose lease has expired has continued in possession for a short time pending a treaty for a further lease does not, ipso facto, create a new tenancy. There must further be present something which shows or indicates *the assent of the landlord* to the new tenancy. No new tenancy can arise without a "grant or contract denoting simple permission."[19]

In this case we can find absolutely nothing in the record from which to infer or imply the necessary assent of the owners to a new tenancy during the eleven-day period after the expiration of the old tenancy and prior to the filing of suit for condemnation. By the testimony of plaintiff, it had been customary for the parties to operate under a written lease. Nothing was said about a new lease. There is no evidence of any plowing or preparation in any manner for a new crop, with or without the assent of the owners. In fact, there is no evidence that, at that time, the owners even *knew* plaintiff had remained in possession. The plaintiff had asserted no new interest and the owners had assented to none. It was in the dead of winter, and it would appear that the status and relationship of the parties between each other and in respect to the soil remained in frozen limbo. *Assuming* that at that time the plaintiff intended to enter into a new tenancy (which he did not testify), it was still the owners' option to treat the plaintiff as continuing in possession wrongfully or as a tenant for a further term.[20] Plaintiff was in no better position than a person who had offered to purchase the land but whose offer had not at that time been accepted. The bare intention on the part of the plaintiff, until

15. Section 441.070 RSMo 1949, V.A.M.S.

16. Ray v. Blackman, 120 Mo.App. 497, 97 S.W. 212, 214; Innes Land & Leasing Co. v. Wyatt, Mo.App., 56 S.W.2d 159, 160; Olson v. Gehlert, Mo.App., 3 S.W. 2d 279.

17. Section 441.050 RSMo 1949, V.A.M.S.; see 51 C.J.S. Landlord and Tenant § 131, p. 728.

18. Thompson on Real Property, vol. 3, § 1024, p. 18, through § 1037, p. 42; 51 C.J.S. Landlord and Tenant § 136c, p. 737; Mastin v. Metzinger, 99 Mo.App. 613, 74 S.W. 431.

19. Young v. Ingle, 14 Mo. 426, 427; Mastin v. Metzinger, 99 Mo.App. 613, 74 S.W. 431; Grant v. White, 42 Mo. 285; Leggett v. Louisiana Purchase Exposition Co., 134 Mo.App. 175, 114 S.W. 92, Id., 157 Mo.App. 108, 137 S.W. 893.

20. Tiffany on Real Property, 3d Ed., vol. 1, § 175, p. 281.

joined by the express or implied assent of the owners, did not create any interest, *or right to claim an interest,* in the plaintiff. We cannot hold that an intention to do something in the future, or a wish that something might or may be done, amounts to a compensable claim of interest in property. The owners could not, on or prior to January 12, have required the plaintiff to continue in possession under the obligations of a tenant for another year; neither could the plaintiff have forced the owners to a renewal of the tenancy. *If* the plaintiff acquired any interest in the particular premises thereafter, he could have done so only because of a *subsequently created* tenancy, which put him in privity with the landlord, subject to lis pendens, and the judgment of condemnation would relate back to the commencement of the suit.

Presumably the value of the growing crop, and what it added to the value of the land, was included in the amount of damages assessed and paid in by the condemner on April 28. What we say here does not militate against the oft-stated rule that the ultimate time of taking in a condemnation suit is when the damages are paid in for the owner; nor has it to do with the right of the plaintiff to have entered his appearance and asked to be made a party, or to have interpleaded and contested for a share of the damages awarded, or possibly to proceed against the owners by way of independent suit. What we are saying is that in this case the plaintiff had no compensable claim of interest in the premises at the time the proceedings for condemnation were filed, and he therefore cannot, in a later and independent suit, claim damages against the condemner for the destruction of a property interest which did not exist at the time the suit was brought and which he acquired or brought into being on the condemned land after the suit was commenced.

It is our opinion that defendants' motions for judgment should have been sustained, and the judgment must be reversed on that account. It therefore becomes unnecessary to consider other assignments of error. The judgment must be reversed, and it is so ordered.

McDOWELL, P. J., and STONE, J., concur.